Eastern Oklahoma is not an Indian reservation for three reasons. First, Congress destroyed all features of a reservation by terminating all sovereignty over the land in the march up to statehood. Second, solemn is not to the contrary. And third, affirmance would immediately trigger a seismic shift in criminal and civil justice. First, Congress stripped the former Indian Territory of reservation status by terminating all tribal sovereignty over the area to create Oklahoma. Disestablishment occurred Sotomayor Exactly when did it do this? What's the exact date? It wasn't in the Enabling Act when the state became, when the state was, well, when Teddy Roosevelt proclaimed it a state, but nothing in the Enabling Act did that. So exactly what did it do? Murphy I mean our position is it was done by statehood. Our position is more fundamentally that we don't have to give you a state, a date. Sotomayor But at statehood, the tribe was still in existence. Shortly thereafter, Congress says it's not going to dismember it. And tribe members still owned property. They were getting property. And it was only after that that the government began to dismember it. Sotomayor It wasn't even that it took the land away from the Indians, that through trickery and deceit they were permitted to sell off their lands. But I'm trying to figure out exactly when. Murphy Sure. Sure. So, again, we don't have to give you a date. Rome did not fall in a day. We know it fell by 476, but it was sacked several times before that. The other thing is that Congress does not have to terminate a tribe's government to disestablish the reservation. A reservation by definition signifies some tribal sovereignty. Not tribal property, but tribal sovereignty over non-Indian-owned fee land. Otherwise, a reservation has no purpose if there's not non-Indian-owned fee land that's being reserved for any purpose. Sotomayor I'm sorry. What are all the Solomon cases? All of those tribes, the issue was whether the deprivation of property was an allotment or a cessation. And in many of them we held it was an allotment because there wasn't clear language of cessation. So we didn't tie it to the ownership of land. Murphy Exactly. And that's my point. In every single Solomon case, you have a statute that transfers surplus non-Indian-owned land. But Congress is silent as to whether Congress also intended to sever the tribe or divest the land of Indian interest. And so cession in all those cases, in Nebraska v. Parker, in Solom and Yankton Sioux, cession itself in one step both terminates tribal title and tribal governance. But here what happened with Oklahoma was that Congress acted in two steps. It first took away tribal title with allotment, and then 20 years of statutes expressly abrogated every feature of tribal sovereignty. Kagan Well, what does that mean, Ms. Blatt? Because as I read the history, it goes something like this. In you said terminating all sovereignty, what happened was that in 1901, Congress said we are going to terminate all sovereignty by 1906. So there was definitely an expressed intent to do that. And then two things happened. First, as an interim measure, Congress extended the tribal government, and it said we're going to extend it in order to wind things up. To wind things up, but to extend it. And then comes the Five Tribes Act. Congress actually changes its mind again and said forget this. We thought it was kind of a bad idea. We're going to extend tribal government for all purposes authorized by law. So, you know, whatever Congress thought it might want to do, it decided it didn't want to do it in the end. Blatt No, that's fundamentally wrong in several respects. First of all, the 1901 Act called for you to do it. Kagan Fundamentally wrong. Blatt It's fundamentally wrong because the 19 — well, it's factually wrong. The allotment Act called for it. Kagan And fundamentally wrong. Blatt And fundamentally wrong. It's factually wrong because the allotment agreement called for the termination of the government. There is no question that Congress never changed its mind about termination of tribal sovereignty. Now, Section 28 of the Five Tribes Act that you're talking about extended tribal governments only for the purposes already existing. Kagan I'm sorry. So you're going to have to go back a little bit for me. Blatt Sure. Kagan Now you're — are you making a distinction between the tribal government and tribal sovereignty? Blatt Absolutely. Kagan And what is that distinction? Blatt I'm telling you, every single session case, the all that matters and what the Court's words were in Solemn, whether it was a divestiture of the tribal interest in the land, a dissolution of tribal sovereignty, it has never been required that Congress has to terminate a tribe. Now, let's look at the — let's talk about the continuum. Kagan Now, I'm still not getting it. What is — Blatt Okay. Let me — let me finish. Kagan Let me finish the question. Yes? What is tribal — the tribal sovereignty that you say is critical to determine whether dissolution has occurred? Blatt Some sovereignty over non-Indian-owned fee land. So that can be one of three things. It can be over the land. It can be over non-tribal members. Or it could even be over tribal members. The five tribes had none of that. Not one single, absolute, smidgen, de minimis act of sovereignty over the land. Breyer Wait. Did you just put in a little word there? Absolute. Blatt Absolute. No sovereignty. Breyer Yeah, yeah. That's because the President could veto what the tribes did. But my guess is that there was a tribal legislature. This is — I don't mean to interrupt you. I'm just — Blatt No, please. Breyer There was a tribal legislature. And what they said, I guess, in whenever it was, the Enabling Act, 1906, that the President had to approve it. Now, I'm not sure I can find any instance which says because the President has to approve the laws passed by a tribal council, that that means the tribe does not have sovereignty. Blatt Right. So this is what — sorry. On the section — Breyer Isn't that — I doubt it. Blatt Yeah. So section 28 only extended the governments for purposes that were already existing. What you said was — what the actual statute says is that all tribal acts will be invalid. This is a restriction on residual authority unless the President approves. Now, just remember, in sections 26 and 28 of the Curtis Act, all tribal courts are abolished. All tribal taxes are abolished in section 16 of the Five Tribes Act. A tribal law was unenforceable. In section 15, tribal — all tribal buildings and furnitures, the tribal schools, property, money, books, papers, and records were all ordered to be turned over or face imprisonment of five years in jail. There — I mean, I could keep going on, but let me — Kagan Is it true that in this period, the U.S. government was doing this with respect to many, many Indian tribes? I mean, in some ways, the creek was unusual because it had a good deal more tribal sovereignty than many tribes had had. But all over the place, the theory of the U.S. government during this period was to try to divest Indian tribes of as many sovereign powers as it could in order to essentially promote assimilation. So if we did that, we would have been thinking about this question in every single one of our solemn cases, because in every single one of our solemn cases, much the same history appears, with the U.S. government progressively trying to strip tribes of various kinds of sovereign powers. There's nothing in particular about the creek that makes that history different. Justice Kagan, that's just not true. In every solemn case, it's just talking about the transfer of land title. That's the whole point of solemn, isn't it? No, that's exactly what I'm saying. Just title. It's — we would have been talking about the stripping of sovereignty if we had thought that that was relevant, because the stripping of sovereignty is there in every single one of the historic background to these cases, that the U.S. government, at the same time that it was acting with respect to title, was also acting with respect to tribal sovereignty and was trying to strip the tribes of sovereignty. And we have never thought that that was relevant to the question. I mean, you can read your cases just as well as I can, and I don't see anything in there that says what you just said. Well, I do in Parker. It's exactly what I'm saying, Ms. Platt. It's not in there. Why isn't it in there? It's not because it didn't happen to every single one of these tribes. It's not in there because we have never thought that the U.S. government stripping a tribe of governmental powers was relevant to the question of whether a reservation existed. I mean, I think this is semantics. Under your view — I just don't know what you mean by reservation. Well, in those cases, was there ever — in those cases, was there an issue about the disestablishment of a tribe? Was there an issue about the extinction of sovereign power of the tribe in toto? No. In Nebraska v. Parker, what the Court said is that the problem, if you're going to have cession, what that means is to dissolve tribal governance. In Solemn, it said you have to divest the tribe of its interest in the land. In no case — I mean, you go through pages and pages of history. In no case do they abolish tribal taxes, abolish tribal court, render tribal law enforceable, seize every scrap of paper, books, record money, schools, furniture and property. I mean, I'm not an Indian law expert, but I've never seen that happen. Oklahoma is unique. The whole point of taking every act of sovereignty. I'm sorry, but they did that. Then allotments should account for that, because the tribe was totally absent with respect to every one of those features for over 100 years in the area it was claiming. And despite that, the Court didn't say that that was a cessation of the tribe with respect to that area. They didn't tie it in the way you're saying. They didn't look at whether there was a lack of sovereignty because the tribe had ceded its responsibilities in some way. Sure. You're right. The tribe was absent. But what's not true in Nebraska v. Parker is that there's express abrogation of territorial sovereignty. It's just that the tribe wasn't exercising it. Here – and let me just talk, if I could, about the express – How could you say that? That's what they were claiming. They got out of the area. Not – That's what the other side was claiming. They got out of the area for 100 years. For the Cheyenne River Sioux and Solemn, for the Omaha tribe in Nebraska, there's not a statute that takes away the territorial sovereignty. There's just a statute that severed the land title. So what you have is non – I mean, every single reservation case you've ever had, the only point of a reservation is that the tribe or the Federal Government can have some ousting of State jurisdiction. Here – let me just talk about the express transfers. This is an express provision of the Enabling Act that took all criminal cases involving Indians and ordered their transfer into State court. And – That was wrong. I give you that point. And it was pending cases. But the – the part that you said before, I mean, I agree with you that they abolished tribal courts. I agree with you. They did. The second thing, though, I'm not sure, because in 1901, the 1901 allotment agreement, according to my law clerk, what she says is that it – for it restricted but did not eliminate the authority of the Greek National Council to pass legislation, quote, affecting the lands of the tribe or of individuals after allotment or the monies or other property of the tribe or the citizens thereof. The President had to approve that. Well, that doesn't get rid of it. The next sentence seems to, because it says the Greek government is going to be dissolved in 1906. But in 1906, they changed it. And they said the tribal – they still continue in full force, in effect. Okay? So what we have in practice is the President can limit the – I say no – what the tribal council does, but it does it. That doesn't sound like, to me, abolishing the tribal government. Now, you're also right on the last part. They should have given the authority on pending cases to a Federal court, not to State courts. So I think they should have because of the India whatever it was. Okay. So you're right on that. But they didn't want to. What? When you say they should have, you're just – you're – No, no, no. If you were wrong, they should have. Right. And then for the last 111 years, there have been tens of thousands of cases that have been – All right. All right. I'd say the question there is, is that a big deal? Yes. Is it a big deal that they, in fact, should have taken pending tribal cases and given them to Federal courts and they didn't? They gave them to State courts. Now, if that's the only thing, it's pretty hard for me to say that that's any kind of express abrogation of the power of the tribe to legislate or carry on other governmental type activities. So the tribe could not exercise a single power. They could certainly elect a new chief and meet for 30 days at a time, but so what? What they couldn't do is exercise any function that signified a reservation. In order to have a reservation – What about affecting the lands of the tribe or of individuals after allotment or the monies or other property of the tribe? What about that? Justice Breyer – They can do it, but it's subject to the precedent. No. In 1906 – you're reading from 1901 – Yeah. Every piece of paper, record book, dollar bill or coin or property, their buildings, their furniture, their desk, everything was taken away from the tribes. So I don't know how they could be doing anything. Their taxes were abolished. Their tribal law was rendered unenforceable. Every single federal court, tribal chief, tribal lawyer, members of Congress, Oklahoma historians and the popular press recognized that the only authority they had was to equalize allotments with the money and sign deeds. But what about 1906? They say, The tribal existence and present tribal governments of the five tribes are hereby continued in full force and effect for all purposes authorized by law unless otherwise provided by law. That does not sound like an abrogation. If – the Act is entitled Fidel Disposition, and the same Act I just read you, there's at least seven provisions stripping them of every authority they had left. In your view, I do concede that they could meet and elect tribal chiefs. And that is it. What you're suggesting is that the idea of a reservation is always and necessarily linked to full tribal authority over that land. And that has just never been the case. That in many instances with respect to many tribes, the idea of a reservation was viewed as perfectly consistent with U.S. government control over that land. And so – and that's why we've never thought that we're sort of measuring tribal power. What we've always thought is that what we're trying to figure out was whether there was ever any time when this reservation, whether the Indians exercised power over it or whether the U.S. government exercised power over it or whether it was something in between, whether that reservation was ceded to the public domain, was given up. And that's what Solem emphasizes. And that seems is missing from your analysis. Justice Kagan, I would concede that you have a reservation with any tribal power, not full tribal power or some Federal power that displays State power. But here it's a null set. It's fine. There is no such reservation. But you could have a reservation where just the Federal government can control non-Indian-owned fee land. But any – I'll take any act of tribal sovereignty that the tribe could exercise over the non-Indian-owned fee land, a non-tribal member, and they don't even have it over their tribal members because they had none. Okay. Could I just go to what I thought Session was about – Solem was about, which is about this idea of Session. So as I understand the history, you have this 1893 act, and it establishes the Dawes Commission. And it very clearly says, look, there are two alternatives here. You can either get Session of the land or you can do allotment of the land and go figure it out. And the Dawes Commission goes and it actually tries to get the Indians to cede the land. It says, we want Session. Session is easier. Session is better from the U.S. government's point of view. And for whatever reason, they think that they need tribal consent, and the tribes aren't giving that consent. And so the commission comes back and they say, no, we're not going to get Session. We're only going to get allotment. And indeed, that was what happened. They got allotment, not Session, which is what makes all the difference under Solem and Solem's progeny, isn't it? No. Remember, Solem was not on the books until 80 years after Oklahoma became a state. Well, Solem wasn't on the books until long after all of the cases. Exactly. But what Solem makes relevant is when we look back to those period, we ask about was it Session or was it something short of Session, meaning allotment? And Congress did the same when they had allotment plus dissolution. Can I reserve the remainder of my time? Certainly. Mr. Kneedler. Mr. Chief Justice, and may it please the Court, what Congress did in the statutes at issue here is fundamentally different from what it did in the line of cases involving Solem. What Congress was doing here was transforming a territory to a state. And in order to do that, Congress broke up the national domain of the tribes. They had been independent nations and it was a territory. The tribal domain was the territorial domain. Congress, as it always does in transforming a territory to a state, changed the territorial domain from here are the tribes to the state. And then it vested the governmental authority over that domain in the state because that domain had become the state's, the general governmental authority. And it did that with respect to Indians and non-Indians alike, as the history that preceded it shows. Beginning in 1897, Congress extended the laws of Arkansas to everyone in the Indian Territory, irrespective of race, and gave the Indian Territorial Courts exclusive jurisdiction over all cases. The next year it abolished tribal courts and said that their laws could not be enforced in the law in the courts of the Indian Territory. And in 1904, immediately before statehood, Congress once again subjected Indians and non-Indians alike to incorporated state law. That is fundamentally inconsistent with the proposition that immediately after statehood, all of a sudden Indians and non-Indians were to be treated differently in the new state. And in fact, we know that wasn't true because Congress provided in the Statehood Act for the transfer from the Indian Territorial Courts to the state courts of all crimes of a local nature. Sotomayor, what's so interesting about that transfer is that in 1906, the Enabling Act does say transfer. But in 1907, the Enabling Act amendment makes clear that the transfer is only of criminal cases. And your opponent says that, and if you read it, they're right, that Federal question issues were supposed to remain in the Federal courts. Now, they didn't. The functionaries transferred all criminal cases, even involving Indians on Indians, to the state courts. But how do we know what Congress intended except by its words? And by its words, it said all Federal question cases, which include major crime act cases, should stay in Federal court. How do we read into what the functionaries did in the court systems into what Congress's intent was? With all respect, I don't think it's fair to say functionaries. These were courts, excuse me, courts that transferred the cases. Courts are not Congress. I understand that, but these were courts that were contemporaneously interpreting the statute that Congress. Sotomayor, Congress, when it did speak, basically said, we're not going to end tribal sovereignty. So the Congress, exactly around this same time period, basically says, we're not going to disenfranchise the tribes, we're going to keep them alive. The question in this case is Tribal authority, or actually Federal and State authority over lands in which there is no Tribal interest at all. We assume for present purposes. Sotomayor, Well, there was Tribal interest. The lands were still allotted to Indians. Kneedler, Yes, but once they were allotted and passed out of Indian ownership or at least passed out of restricted status, they were like all other lands in the State.  Those are not the allotted lands that have passed out of Tribal ownership. Today, there is less than 5 percent of the land in the Creek Nation is now restricted or trust property. The rest of it has all passed out of Indian ownership, as Congress intended. Alito, I'm sorry. Could you say something about the practical effects of the Tenth Circuit's decision on Federal law enforcement and the Federal judiciary in eastern Oklahoma? Kneedler, Yes, it would be dramatic. It would transfer, and we assume this would apply to all of eastern Oklahoma, not just the Creek Nation. All of eastern Oklahoma, any crime involving an Indian as a victim or a perpetrator would be subject to Federal jurisdiction, not State jurisdiction. And there are not the FBI resources, the U.S. Attorney resources, the other resources. It would also call into question a number of convictions that have been obtained under State law over the intervening years. And beyond law enforcement, under this Court's decisions in Sac and Fox and Chickasaw, the Indians could not be taxed by the State in the entire area of the former reservation of income tax if they earned it there. They couldn't be imposed a sales tax. This would be a dramatic change from the way everyone has understood it for the past 100 years. Alito What would be the definition of an Indian for these purposes? Kneedler, I think an Indian would be at least any tribal member. For criminal jurisdiction, you don't actually have to be a tribal member. Being eligible for tribal membership is sufficient. Something like 10 percent, I think, of the population of 1.8 million in this area, including the City of Tulsa, is in this area. And that would be, there's no reservation like that in the country. And after 110 years of everyone agreeing with this Court's decision in Hendricks, as we point out in our brief, shortly after Statehood involved a special jurisdictional statute, but the underlying premise was that a case involving an Indian otherwise would have been transferred to the State. No one questioned that. Sotomayor All of those things can be changed by Congress, can't they? Congress has the plenary power to give or take. Kneedler Well, with respect to retroactive effects on existing convictions, there would be a serious question as to whether, and that's no small matter. There could be several thousand convictions, as I understand it, in State court that might be called into question. But if I could go back and just explain why this is so different from the solemn line of cases, if you look between beginning in 1893, Congress believed that it had to break up the national domain of these Indian nations in order to have a State. The two went hand in hand. So breaking up the national domain, which now includes a whole lot of No, it made breaking up the ownership of land, and it accomplished that with the allotment. Kneedler It was more than that, because the tribes in their treaties were given these as permanent homelands, which was both governmental and property. Congress believed it had to break up those, that national domain and the national sovereignty, and transfer it to the State in order to have a State. And in the meantime, Congress had to do that. Kagan But the question is, Mr. Kneedler, did Congress, in fact, do that? Did Congress, in fact, decide that that was essential to statehood, or did it do something less? Did it decide that it could make do with something that was short of the cession of lands that we've required in these cases? So if I could just go back to the question that I ended with Ms. Blatt on, I mean, it seems here Congress is very clear about we have two pathways, and we'd prefer cession. And then the Dawes Commission comes back and says, we'd prefer cession, too, but we're not getting cession. We're only getting allotment. And that is exactly the distinction that our cases have deemed relevant when it's come to looking as to whether there's the kind of transfer of land that destroys  Kneedler If I may, there's nothing in the Dawes Act that said Congress preferred one over the other. Kagan It says that there are two pathways, and then the Dawes Commission says it's really simpler to do cession. We wish we could do cession. We can't do cession. Kneedler It's simpler, but that has nothing to do with jurisdictional authority. On page 79A, the Dawes Act, in relevant part, is set out. It's commanded the commission, either by cession or allotment, to do what it did to enable the ultimate creation of a State in the area. So Congress saw the Kagan It's agreed. Agreed. They thought that you could get a State either way. Cession was not necessary for a State. It was preferable for a State, but it wasn't necessary. And the Dawes Commission comes back and says, we can't do cession. We're going for allotment. They got their State anyway. What they did not do was to destroy the reservation in the way that Solem and all those cases that we've decided, and we've decided lots of them, have indicated is necessary to see before we say that a reservation doesn't exist anymore. Kneedler I respectfully disagree, because what they did was they broke up the nation, which was the – and allotted it to individual members. There were already, at the time of statehood, 700,000 non-Indians living in this  There were already 70,000 Indians. It was overwhelmingly non-Indian at the time, and Congress had become very dissatisfied with tribal government over that area. That was the very reason that it prohibited the enforcement of tribal ordinances and gave all jurisdiction to the territorial courts. It's fundamentally inconsistent with that to think that upon statehood, Congress all of a sudden wanted – or not all of a sudden – wanted to continue tribal sovereignty that did not exist. Congress had already taken away the governmental or sovereign part that is tied to – that is tied to session in those other statutes. Ginsburg Before you sit down, you said very quickly the ramifications of the court of appeals decision in areas other than criminal jurisdiction. You mentioned tax, I think. Can you state again what is the effect of this decision on areas other than state versus federal jurisdiction? Kneedler Under this Court's cases, a tribal member cannot be taxed, for example, for sales tax, cigarette tax, gasoline tax, where the incidence is on the tribal member, anywhere within a reservation. And a tribal member cannot be assessed state income tax, at least where he resides and works on the reservation. And given the size of these territories, that could be quite a number of people. The liquor ordinance that was at issue in Parker requires tribal consent to the sale of liquor on a reservation. I imagine that would apply to any bar or any liquor establishment that may be in all of eastern Oklahoma. And again, 10 percent of the population is Indian, so the criminal jurisdiction concerns are really very serious, and the United States is very concerned about what would be a drastic shift in criminal jurisdiction. Roberts Thank you, counsel. Mr. Gershengorn. Gershengorn Mr. Chief Justice, and may it please the Court.  I'm going to start with the text that Parker confirmed. Parker confirmed that the text is what governs, and the text here is particularly clear. Congress considered hallmark language that would have disestablished the reservation and Congress rejected it. So in 1901, Congress initially sought session, and when the Creeks refused to cede their land to the United States, Congress instead enacted text that instead went for only allotment. And in 1906, when congressional inaction would have dissolved the tribe and disestablished the reservation, Congress instead enacted text that preserved the tribal government for all purposes authorized by law, and it did so precisely to prevent the land from going into the public domain. Alito Is it your position that there are certain magic words that have to appear in statutes? Gershengorn Absolutely not, Your Honor. So our position is not that there be magic words, but that the words be clear. But our particular point here is not the absence of words, but that Congress specifically rejected the magic words that this Court has identified. Breyer As to that, I just quoted the very thing you did, which is from the 1906 Five Tribes Act. And Ms. Blatt said, well, if you read the whole act, which I confess I haven't, you will see that in that act they removed, having previously removed all the courts, they removed the power to legislate anything except perhaps electing a chief. Now, if that is so, is that so? And that would be my first part. Gershengorn No. Breyer That is not so. So when I read this, I will discover that even after 1906, when it says the tribal existence and present tribal governments are hereby continued in full force and effect for all purposes authorized by law, that that has content. So what is the content? So I want to be very clear that what we're talking about on the congressional text, the points Your Honor has made earlier is exactly correct, that Section 42 of the 1901 Allotment Act preserved Creek legislative power over in any manner affecting the lands of the tribes or of individuals after allotment. So that preserved presidential legislative power subject to the presidential veto. In Section 28, what Congress did was exactly what Your Honor said, that the tribal existence and present tribal government are hereby continued in full force and effect for all purposes authorized by law. Breyer And what were those? Because 1901 is followed by 1906. And I believe, though I don't want to put words in her mouth, I believe that Ms. Blatt said if I read earlier in the 1906 Act, what I will find is lots of provisions that suggest they are simply winding up affairs, and the purpose of the government is to wind up affairs and then perhaps continue to elect a chief. That's what I'm interested in. Gershengorn Yes. So, Your Honor, that's pure ipsy-dixit. That's not what the text says. And what's critical here is that Congress had done that wind-up authority. In the 1906 joint resolution that's cited in our brief, Congress had preserved tribal authority until all of the allotments had been made and the deeds had been sent out. What Congress did in the 19 — in the Five Tribes Act was something very different. Congress added Section 28, which preserved the tribe for all purposes authorized by law. And it's critical, when you think about how this was implemented as opposed to the text, that the United States opposed that. So Congress implemented Section 20 — sorry, the United States, the executive branch opposed that. Congress implemented Section 28, preserving the tribal authority over the objection of the secretary and over the objection of the executive branch. Sotomayor Could you tell me what remained? Gershengorn Yeah. So, Your Honor, I just — what remained is the ability to legislate over the land. Now, it was dependent on the secretary approving it, and it was dependent on the president approving it. So executive branch hostility was a problem. But in the wake of the Act, there were a number of legislative actions that the tribe took. It abolished tribal offices. It created the Office of Executive Interpreter and funded it. These were legislative acts that went to the secretary. Roberts That's the best you've got? Gershengorn So, Your Honor, I — there is no doubt that the legislative — in practice, on the ground, the legislative power of the tribe was greatly reduced. It was working with an executive branch dedicated to its — to the tribal extinction. But that's not what Congress did. And what this Court has said is we look to see what Congress did. And the exact purpose of— The best example you have of the tribe's continuing authority is hiring an interpreter? Gershengorn So, Your Honor, the — I just want to be very clear. What the tribe did was approve appropriations and payments out. Those went to the secretary and to the president. They hired and they fired. Then in 1909 and 1914, when Congress needed to equalize allotments, what Congress did was say, we want to know whether the tribal legislature approves. The tribal legislature got together and disapproved. This was in 1909, disapproved the congressional action. After 1909, it is — and the same thing happened in 1914. But I just really want to step back and distinguish between what Congress did and what was happening on the ground, because I think it's really critical. As we detail in our brief, both the executive branch and the State were acting very much in hostility to the tribe, trying to eliminate the tribe. And, in fact, what the Harjo Court said — I urge the Court to read the Harjo decision that's cited in our brief — was this was a campaign of bureaucratic imperialism precisely because the executive branch didn't get its way in Section 28, and therefore was hostile to the tribe. So, in fact, what the tribe was doing in continuing to legislate was really critical. Now, what Mr. Kneedler was suggesting was somehow they had to get rid of tribal sovereignty in order for there to be a State. That's just not true, okay? In 1790 in Tennessee, three-quarters of the State was reservation. When South Dakota came into the Union, 47 percent of South Dakota was reservation. And when Arizona came in, 24 percent was reservation. So the idea that you had to eliminate a reservation is not correct. And, in fact — Breyer. That is correct. But I wish at some point we would go back to Justice Alito's question. There are 1.8 million people living in this area. They have built their lives not necessarily on criminal law, but on municipal regulations, property law, dog-related law, thousands of details. And now, if we say, really, this land, if that's the holding, belongs to the tribe, what happens to all those people? What happens to all those laws? Should we, for example — were we to decide this? I'm not saying one way or the other. Do what the Court did in Marathon and say Congress has a certain number of months before the — our holding goes into effect, so you could try to work out whatever compromises are necessary with the State and with the feds and with the tribes. Should we just leave it all to the Tenth Circuit? What would you do? So, Your Honor, I understand the point. And my overall answer, which I will then provide more details, my overall answer is the State's concerns are dramatically overstated. But in any event, this Court has doctrines designed to address it, and what Parker made clear is that's not part of the disestablishment analysis. That's separate under a Sherrill analysis. But let me address just point blank all of the kinds of concerns. Let me start with criminal jurisdiction. So with respect to completed criminal cases, the Tenth Circuit has already held in a case called In re Brown that you can't bring a Murphy claim in a second or successive Second Tenth Circuit has already held that. In the State already completed convictions, we don't know what the State would do, but the State has a latches doctrine. The State hasn't tried to apply that yet. With respect to future criminal laws. Roberts, obviously the Tenth Circuit decision hasn't been looked at by us, but we are talking about people who were convicted of murder and sentenced to life by somebody who had no authority to prosecute them. That's a matter — should be a matter of some concern to the government, don't you think? So, Your Honor, it is concern, as are habeas rules, which this Court has repeatedly upheld. And as I say, the Tenth Circuit has addressed this question squarely and said that the cases — that cases cannot be brought in a second or successive habeas petition. Going forward, Mr. Kneedler identified the burdens on the government. I will say that at the Tenth Circuit, the government said there would be 2,000 cases a year that they had to deal with. Then in the op to this Court, they said 500 cases a year. And then in the merits brief to this Court, there was no discussion at all of any case numbers. So I view that with some degree of skepticism. There is no doubt there will be a transfer of resources. There is also no doubt that the Federal Government has a lot of resources. So on the civil side, Justice Breyer, which I understand is your concern. I found it interesting that you asked — that Justice Alito asked Mr. Kneedler what the impact would be, and the thing he identified, which we agree with, is that there will be limits on State authority over income tax and sales tax of tribal members on the reservation. I would agree that's significant. I would not call it existential. And in any event, this Court has authority under the Sherrill Doctrine, and certainly Congress has authority to change that. Stepping back, this Court's cases, in cases like Plains Commerce Bank and the whole reservation. And so I'm asking you what you would do if you were me if you thought on all the doctrinal things that you were right. Because imagine you are a small businessman in Tulsa, and suddenly our court decision. And all they know is they're part of the reservation. What I'm concerned about is they think, I have 5,000 laws already to deal with. Infinite numbers of forms to figure out. What do I do? So, Justice Breyer, I'd like to make a factual point, and then a how would I solve it point, if you thought there was a problem. This Court has already drastically restricted. I'm asking you whether there's a problem. There is not. But let me explain why, but then even if you disagree, what you could do about it. All right? I don't think there is a problem, because this Court has already — although the person may wake up and say, gee, I'm in a reservation now. In fact, this Court's cases have already limited tribal authority over nonmembers on fee land within a reservation. That is the point of the whole Plains Commerce line of cases. So although the person may wake up and say, oh, I'm in a reservation, the answer is, your life doesn't change all that much. But if Your Honor disagreed with that, what this Court did in Justice Thomas's opinion in Parker was say, we separate the equitable and remedial issues, such as those that are at issue, Your Honor's question, go to, we separate those and deal with that through a separate doctrine called City of Sherrill. And the Court, of course, has that at its disposal, and the Court could, in an appropriate case, or if there was an effort to exercise authority, the Court could decide whether that was a problem. So I don't think that the kind of seismic change that Ms. Blatt identifies or that Mr. DiGiorgio-Busti would exist. Roberts. Just to pause for a moment. You say there's not going to be any difference when you wake up. What if the tribe decides not to allow the type of business in which you're engaged, such as alcoholic beverages, and you're in a reservation? Can they say you need a license from the tribe to sell alcoholic beverages and they're not going to give you one? Alcohol has always been separate, has been special in Indian lands, and with respect to alcoholic beverage in particular, there may be additional regulation. That depends on what the Court does with Sherrill. With respect to a construction business operated by a nonmember on fee land, no. What about one operated by a member? So additional, yes, there would be additional regulation of a member on fee land. But that is, but the Court has always been. What about dealings between nonmembers and members on fee land? So I don't think that that's part of, part of the, I don't think that is part of the tribe's regulatory authority. But the bigger point, Your Honor, is that this Court interests. Could the tribe require those nonmembers doing business with members on Indian land to have a license to do that? So, Your Honor, I don't think the answer to that is yes. I don't think so. But in any event, this Court addressed this, all right? This is not new to the Court. The Court faced this very question in Parker, right? In Parker, the tribe, unlike the Creek, unlike Creek, the tribe had been absent for 120 years and the, and then asserted regulatory authority. And what the Court said was that is no, not part of the disestablishment analysis, right? That's part of the remedial analysis, because that is, that goes to what should  Roberts. Right. I understand that part of the, the remedial issues with respect to a tiny village like Pender that was at issue in Parker and with respect to half of Oklahoma are obviously going to be quite different. I agree that the remedial issues could be different. And, but, although I want to address that a little more. But the statutory construction issues are not different. And that really is the fundamental piece. But here you have a fundamental principle of law that derives from Sherlock Holmes, which is the dog that didn't bark. And how can it be that none of this was recognized by anybody or asserted by the Creek Nation, as far as I'm aware, for a hundred years? So, Your Honor, I don't think that's accurate for a number of reasons. First of all, for the last 40 years, when the Creek Nation adopted a constitution in 1979, they asserted political jurisdiction to the extent of their 1900 boundaries and the Secretary approved that constitution. So this is not like the situation in Parker where the tribe was absent for 130 years. The place where you're at. Alito, as a practical matter, have they at any time prior to this case attempted to do, to assert any of the sovereignty that you now claim they possess over this vast territory? So the answer is yes. And so I'll give you an example. So the tribe currently is engaged in, the tribe currently pursuant to cross-deputization agreements throughout the historic boundaries, the 11-county area, exercises arrest authority over Indians and non-Indians alike. The reason they do that is because they have entered into agreements that are premised on the assertion of jurisdiction throughout the land. In fact, if you were in a car accident in fee land within the historic boundaries, you would be driving, you might be driving on roads owned and paved by the tribe, the first responder might be a tribal police officer, and you might be taken to a community hospital built and run by the tribe.  Go ahead, finish. No, it is not a situation where the tribe has been absent. We have a lot of cases that say historical practice helps inform the text. And we have these debates about the text. I'm not sure I agree with you, given the abolishment of tribal courts and the things we've discussed. But even if it were ambiguous on the text, the historical practice for a century has been against you. And stability is a critical value in judicial decision-making. And we would be departing from that and creating a great deal of turmoil. And so why shouldn't the historical practice, the contemporaneous understanding, the hundred years, all the practical implications say, leave well enough alone here? So, Your Honor, I would like, I just want to put a footnote that I'd like to come back to you on the text, because I disagree with your concern about the courts. I think it's critical to address it. But with respect to your larger point, I'm not saying the Court needs to ignore it. And the Court in Parker did not say we should ignore it. The Court there dealt with somebody with the absence of a second point. This is massively, the size is different, the number of people affected. Absolutely. Absolutely. Tulsa is not Pender. But what I'm suggesting to you is the question of whether This was 1910. Maybe we're talking about it differently, but it's not. What I'm suggesting to you, though, is the difference between Tulsa and Pender comes into the question about what is the sovereign authority that the tribe gets to exercise. It is not about the question about whether the reservation continues to exist. That is a statutory question. Your Honor is correct that cases have said history matters. Actually, in Parker, what the case said was exactly the opposite. When it comes to disestablishment, history does not matter. It's a clue at the end. And the reason for that, of course, is because what you're engaged in is fundamentally an exercise of statutory construction. But you're looking at a series of statutes here. Look at contemporaneous understanding, which is against you. The practice for a hundred years. The practical implications. Trying to remedy this, as Justice Breyer points out. This seems like a lot. So I don't think that the text is against us, Your Honor. I really think that when you read the cases, what the cases say is we're looking for language of session precisely to distinguish cases where all that happened was they opened the land to tribal settlement. It's not a single piece of text. I'll grant you that. But it's a series of things that together, when you look at the courts, you look at the laws of Arkansas, the forbidding the enforcement of tribal law, subjecting tribal members to state law, the Federal courts transfer the jurisdiction to state courts upon statehood. It's all these acts together, which is different, in the context of statehood, is a major difference. Yes. Two points on that, Your Honor. So a lot of the things you referenced were in the 1901 Act. There's no doubt that the reservation continued post-1901. And so those things you're talking about, the courts and others, those happened and yet the reservation continued. Now, with respect to courts in particular, I forget now which Justice said it, but maybe it was Justice Kagan, the elimination of particular powers like the power over the courts and things like that, it's a misunderstanding, I think, of what it takes to disestablish, what sovereignty, what reservations are getting at here. There's no particular sovereign power that a tribe needed to have. In fact, there would be, you could see a time, for example, if a State overran tribal government, where the Federal government would take over all three branches of tribal government, because the reservation is a combination of tribal and Federal authority protecting against State hostility. And so it's a mistake. I'm sorry, Your Honor. But does that take into account the significance of the fact that the Creek received the land in fee rather than in trust? Because once you say the reservation doesn't matter, well, maybe it doesn't matter if you're in a trust relationship. But if you've already gotten the situation where it's ownership direct, then maybe the significance of what you can still actually do, not what particular powers they could exercise, but whether they could exercise any powers, then the fact that you really don't have a reservation to start with that is like the other reservations in the country, what is the significance of that distinction? So we think, Your Honor, that that strengthens our position. We said it in the briefs. The reason for that is it's crystal clear there was a reservation to start, and the fee patent was an additional boost. Remember, the fee patent is not fee simple. Of course, they can't sell the land without, they can't alienate it. If they abandon the land or disappear as a tribe, it reverts to the United States. So it's not a fee patent. That's it. But that changed with respect to the allotments. Yes, Your Honor. There's no doubt that the reason Congress did, the reason they broke up the communal land ownership and broke up fee patents was to allow sort of increased sale. They needed to do that. But that doesn't change the fact that there was a reservation ahead of time. It was land set aside for the use and residence of the tribe. Congress repeatedly referred to it as a reservation. It's noted in our brief. In the 1866 treaty, the Creek Reservation. In the 1866 Cherokee Treaty, the Creek Reservation.  So there was a reservation ahead of time. That reservation was not disestablished. Congress chose precisely the words that don't disestablish when it acted. Roberts. Thank you, counsel. Mr. Kanji. Mr. Chief Justice, and may it please the Court, if I may, I would like to address three things. First, this issue of consequences. Second, to return to the question of governmental powers. And finally, to talk a little bit about contemporary understanding. With respect to consequences, there will not be turmoil from an affirmance. The Creek Nation wishes to be very clear that significant practical disruption would result from disestablishment, not from retention of the tribe's recognition of the reservation. It is true that Tulsa is not Pender. But Tulsa is not different from Tacoma, the city of Tacoma, much of which lies within the Puyallup Reservation, or from the millions of other acres of land which this Court set in Atkinson. Non-Indian fee land lie within reservation boundaries. There will not be turmoil because of three reasons. One, this Court's precedents restrict tribal power over non-Indians on fee lands within reservations. Those are restraints that we understand and respect. Secondly, and conversely, the State retains plenary authority over non-Indian fee lands within reservation. Plenary authority to tax and to regulate. And third, in Oklahoma, the history of Oklahoma is not exceptional. But what is exceptional in Oklahoma is the extent to which the State and the nations have forged cooperative agreements that already address many of these issues. Alitoson Well, suppose an Indian is charged with having committed a mugging in Tulsa. Where would that case end up? An Indian, Your Honor? Roberts Yes. Alitoson Well, that case would end up either being prosecuted by the Federal Government or by the nation itself, or both concurrently. Roberts Okay. How many cases like that do you think there may be? Alitoson Well, as Mr. Gershengorn said, we have these estimates from the Federal Government, which I think were clearly inflated. There may be 100, 200 a year, that sort of thing. It's important to understand. What percentage of the population of this area would qualify as Indians? Alitoson Of the entire reservation area, about 9 percent, Your Honor. Alitoson 9 percent of how many people? Alitoson 9 percent of about the creek population is 43,000. Alitoson Yeah, but all the Indians. So this would apply as far as criminal cases to all Indians. Am I right? Alitoson That's correct, Your Honor. Alitoson And how many would that be? Alitoson Well, we don't have exact numbers, but 50,000 to 60,000 Indians within the reservation area. Alitoson So if any of those individuals was charged with any offense that would normally be prosecuted in a state court, they would all have to be prosecuted in a Federal court? Alitoson Or by the nation. And I think it's important to reinforce that the nation has robust criminal jurisdiction, has robust courts, is already prosecuting many Indians. The nation also supplies a special U.S. attorney to the United States to prosecute major crimes as pursuant to congressional authorization. It's critical to understand nobody has a greater interest in law enforcement and security within the creek reservation than the Indians. Breyer It isn't just that. You said something about cooperative nature. And most of the laws that have been passed by the creeks, which were mentioned by Mr. Gershengorn, were passed pursuant to much later statutes passed by Congress. And how is there anything we can do to encourage, require, what? To have the creek nation, the State, and Congress work this out to see if there are difficulties, and if so, resolve them by statute or regulation. You see, you're asking me something I don't know. I don't know how much trouble this causes, and the reason there's a picture of Tulsa in the brief, I thought, was to stimulate me to ask such a question. Breyer Exactly. Your Honor, I think that the simplest answer is that an affirmance will stimulate exactly that kind of discussion and agreement. The last time this Court had a case from Oklahoma involving jurisdiction was the Chickasaw Nation case in 1995. This Court ruled in favor of the Chickasaw Nation. Shortly thereafter, fuel tax agreements were forged in the wake of that. The same will happen here. There already are discussions taking place here about the allocation of jurisdiction. Congress has provided mechanisms for the allocation of both criminal and civil jurisdiction. Roberts You're talking about discussions between Congress, the State, and the nations? Gershengorn Correct, Your Honor. Roberts And you think that will lead fairly quickly to an agreement that will settle all these disputes? Gershengorn I think all sovereigns have an interest, a very common shared interest, Your Honor, in law enforcement. The brief of the Oklahoma officials, I think, evidences that there is a very close working relationship, in fact, on the ground between the State, the local units of government, and the nation. That will continue. Alito Can there be such a thing as a reservation that exists as an abstract matter, but in this territory the nation is able to exercise no sovereign powers as a practical matter? Is that a possibility? Gershengorn It is, Your Honor. A reservation, as Justice Kagan said, when Congress takes any block of land, reserves it from the public domain, reserves it for sale, that creates the reservation. Then in order for that to be returned to the public domain or to be disestablished, Congress has to expressly indicate that intent. There have been not just with, and I think this is a critical point that Justice Kagan suggested to, there have been reservations around the country over time where Congress has abrogated tribal powers. Alito Can So if we don't agree with you on that point, if we think this is a practical inquiry, could you tell me what sovereign powers the nation retained within this territory after statehood? Gershengorn Absolutely, Your Honor. It retained legislative powers. I think the 1909 Congressional Act that we cite at page 24 of our brief is instructive. There Congress was attempting to equalize allotments on the reservation. It made its efforts contingent upon approval by the Creek National Legislature. The National Legislature refused to give that consent. So not only did Congress recognize that the legislature remained in force, but the Congress did not. Alito Can Could tribal laws be enforced at that time after statehood? Gershengorn Yes, Your Honor. Just as before statehood, they were being enforced by the Secretary. And I think a critical point is this Court in Morris v. Hitchcock and the Eighth Circuit in Buster immediately before statehood affirmed the nation's continuing legislative authority, including with respect to non-Indians, and said that the secretarial enforcement mechanism was the mechanism to enforce the continuing legislative jurisdiction. Kagan Could you say a little bit more, Mr. Kanji, though, about the converse proposition that there indeed have been reservations, that everybody has understood to be reservations historically throughout the country where tribal governments exercised precious little authority? Gershengorn Absolutely, Your Honor. And I'll give you a general and a specific example. Generally speaking, Congress has told the tribes over time, your government will be structured in this fashion. Your membership will consist of the following. You will allow this mining and these easements on your land even if you don't want it. You will allow your children to be taken away and placed in boarding schools even if no parent would want that. Even the rhetoric about buildings being sold, the Creek Nation is not the only tribe in this country, far from the only one, to have run its government out of churches and house basements for decades. A specific example is the Metlataka Reservation in Alaska, the only Indian reservation in Alaska, as this Court said in the Venati decision. This Court's decision in Egan from 1962 indicates the draconian restrictions that that government was laboring under. It had no authority to approve anything without the approval of the local education commissioner, and yet that was still understood and is still recognized as an intact Indian reservation. Justice Breyer talked about the approval of ordinances by the President. I think it's instructive. Today, the Creek Nation does not have a presidential or secretarial approval requirement, but many tribes in this country do, including the Omaha tribe that was the subject of Parker, the Cheyenne River tribe that was the subject of Solomon. Both of their constitutions, there is a requirement that the United States inserted that the Secretary has to approve largely any and all of their ordinances. So the question is, is there a need to approve any and all of their ordinances? Roberts. Counsel, would this expand the reach of the Indian Gaming Act in the area? It would not, Your Honor, in the sense that there is a compact in place between the Nation and the State already. The Nation has eight gaming operations within the area. What about the Oneida tribe idea of lachi? Is there something like that? Well, I think that was a critical point in Parker, Your Honor. In Parker, this Court declined to reach the diminishment decision and said, we will apply this lachi doctrine to this particular exercise of power by the Oneida tribe. Here, we don't even have an assertion of power by the Creek Nation. The Creek Nation had nothing to do with the genesis of this litigation. If in future cases we were to assert our authority in a way that others found objectionable, they could raise a Sherrill claim, and that could be adjudicated at the time. But the important thing is reservation disestablishment is a binary thing. The State is asking to snuff out all Creek governmental powers over this area. As we document in our brief, the Creeks are doing many things that pose no affront to the justifiable expectations of anybody, but that in fact serve the expectations of all but hardened criminals. The Creek Lighthouse Force polices the entire reservation pursuant to these cross-deputization agreements. The Creeks are providing health care, education, infrastructure, and this is all vital, and a disestablishment would snuff all that out. Thank you, counsel. Chief, may I just ask one question to follow on that? Sure. Your colleague also said the same thing, but when you say they've been policing and doing these things in the reservation, are you talking about the entire area in dispute right now? Absolutely, Your Honor. There are 44 county and municipal jurisdictions in the Creek Nation reservation. The Nation has cross-deputization agreements with 40 of them, so almost the entire area. And for how long has this been in effect? Those agreements first started in the year 2000, Your Honor, and a critical point I'd like to make in terms of disruption is they are all subject to renewal each and every year. And in 1936, the tribal courts were reignited. That's right. Tribal courts. And what area did those tribal courts exist in? They likewise exercised jurisdiction over the entire reservation. Entire reservation. That's correct, Your Honor. Thank you, counsel. Two minutes, Ms. Blatt. Thank you, Mr. Chief Justice. Here are the two earth-shattering consequences that Congress can't fix, Sherrill can't fix, and this will stimulate you. There are 2,000 prisoners in state court who committed a crime in the former Indian Territory who self-identify as Native American. This number is grossly under-inclusive because if the victim was Native American, the state court also lacked jurisdiction. That's 155 murderers, 113 rapists, and over 200 felons who committed crimes  Here's why habeas is not going to help. As footnote 5 in the Tenth Circuit's decision says, there are no apparent procedural bars in state court to lack of subject matter jurisdiction. The reopening of any of these cases would re-traumatize the victims, the families, and the communities. Nor is it clear that the Federal Government could retry any of these cases because the evidence is too stale or the statute of limitations has expired, which appears to be the case in about half of them. Here's the earth-shattering consequence on the civil side. Under the Indian Child Welfare Act, any tribe, any parent, and any child can undo any prior Indian Child Welfare custody proceeding if the state court lacked jurisdiction because the Indian child lived on a reservation. Affirmance raises the specter of tearing families all across eastern Oklahoma and probably beyond for years and years and years and years after the fact. ICWA also means, and I don't see the tribe agreeing not to enforce ICWA, ICWA also means that any Indian Child Welfare proceeding must be brought exclusively in tribal court, even over the parent's objection. That's on the consequences. On the tribal sovereignty, with all due respect, I didn't hear an answer. The most that they said was they dispersed tribal funds. That is not sovereignty over non-Indian-owned fee land. Thank you. Well, Ms. Black, since there was an extension for the time on the other side, could I ask this question? There seems to be a disagreement between the attorneys here about the authority of the nation to enact and enforce laws after statehood. Could you just briefly address that? I mean, that's preposterous to the extent that it affected non-Indian-owned fee land, non-tribal members, or tribal members. Every tribal chief that we cited, every federal court, every tribal lawyer, members of Congress, every Oklahoma historian, and the popular press recognized and some of these are not racist, but they are the foremost Indian scholars of the time of Oklahoma that the tribal governments had ceased to function. Thank you. Thank you, counsel. The case is submitted.